## APPEAL OF WHITE CITY ELECTRIC CO.

Docket No. 2347.  Submitted June 1, 1925.  Decided September 30, 1925.

> A creditor who enters into an arrangement with other creditors, under which the debtor's property is placed in the hands of a trustee with the understanding that each creditor is to participate proportionately in the operation or final disposition of the debtor's property, is not, under the Revenue Act of 1918, entitled to write off the claim as a bad debt until the security has been exhausted.

*Frederick D. Silber* and *George S. Ward, Esqs.,* for the taxpayer.
*Robert A. Littleton, Esq.,* for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This appeal is from the determination of a deficiency in income and profits taxes for the calendar year 1920 in the amount of $7,456.33.

### FINDINGS OF FACT.

1. The taxpayer is a corporation duly organized under the laws of the State of Illinois, with its principal place of business at 14 North Franklin Street, Chicago.

2. A corporation known as the Midway Gardens was in 1915 indebted to a number of creditors in the sum of $161,000. It owed the taxpayer $20,000. Its principal asset was a 99-year lease on a lot located at Sixty-third Street and Cottage Grove Avenue, Chicago, on which it had constructed a building. Against this building a number of mechanics' liens were filed by the creditors. This corporation owed a large amount to materialmen and contractors, and was unable to pay. It gave notes to all of its creditors, secured by a lien on the 99-year lease on the lot upon which its building and the business were located. One payment to its creditors was made, which reduced taxpayer's claim to $18,000, and thereafter the debtor was unable to make further payments of any kind prior to the end of the year 1920. The ground rent payable under the 99-year lease was about $20,000, and in addition the lessee had to pay the taxes and insurance, making total carrying charges of about $30,000 per annum.

3. In 1916 strict foreclosure proceedings were instituted by lien holders and title to the 99-year lease became vested in the Chicago Title & Trust Co., as trustee, under an arrangement whereby each creditor received a certificate evidencing the same fractional participating interest in the avails of the sale or other disposition of the 99-year lease that he had as an original creditor on his note. Under the terms of the deed of trust no creditor had any legal interest in the 99-year lease, and taxpayer held this participating fractional-

92208—26——45

interest certificate from the time of the foreclosure until December 31, 1920, when the $18,000 was charged off by taxpayer as a bad debt. At the time of the foreclosure, the certificate holders appointed a committee of three, consisting of Martin J. Isaacs, Clarence T. Seipp, and Arthur Schiller, who were empowered to manage the property in the interest of certificate holders. The members of this committee were all creditors of the Midway Gardens Corporation. This committee from 1916 to 1922 functioned actively and endeavored in every way to save something for the creditors. They leased the Midway Gardens to Richard Ostenrieder who operated a beer garden in connection with the giving of concerts, and he was able to pay sufficient rent to pay overhead expenses until the latter part of the year 1918. In the year 1919, as a result of prohibition legislation, the tenant could no longer carry on said business at a profit and the trustee was unable to collect sufficient revenue to discharge the payment of ground rental, taxes, and insurance for 1919, and the owners of the fee gave notice that they would declare a forfeiture of the lease and take possession of the property. To prevent such forfeiture, Martin J. Isaacs and Clarence T. Seipp, members of the certificate holders' committee, personally pledged their respective credit to the extent of $15,000 with the trustee to cause the said trustee to advance the amount necessary to pay the ground rent and taxes for the year 1919. None of the other certificate holders or interested parties were willing to advance any money to save the 99-year lease.

4. In 1920 Ostenrieder, the tenant, suffered additional decrease in business and before the close of the said year he went into bankruptcy in the United States District Court of the Northern District of Illinois. The committee had two other tenants, with a very small rental income, on part of the property, which rentals did not exceed $2,500 per annum, as against fixed obligations on the part of the trustee in excess of $28,000, and the committee, or the individual members thereof, in the year 1920 refused to pledge their respective credit in order to save the lease, but Martin J. Isaacs, on account of his personal relationship to one Haight, representing the fee owners, was able to prevent the termination of the 99-year lease during the year 1920.

5. During the year 1920, taxpayer made frequent efforts to sell its participating certificate, at any price obtainable, to bankers and brokers and other creditors of the Midway Gardens Corporation, but was unable to obtain any offer and was unable to sell it.

6. The Board of Review of the City of Chicago in 1920 reduced the proposed assessment on the taxpayer's personal property in consideration of the opinion of the said Board of Review that said participating certificates were worthless. In December, 1920, the taxpayer took up the matter of deducting the said $18,000 as a bad debt

with the deputy collector of internal revenue at Chicago, and the deputy collector advised the taxpayer that he could properly deduct said sum of $18,000 as a worthless debt after he had investigated this matter.

7. Taxpayer in 1920 offered said participating certificates for sale to Clarence T. Seipp and to Martin J. Isaacs at from 5 to 10 cents on the dollar, but neither of them would purchase these certificates at that price. Taxpayer in the latter part of 1920 was advised by Martin J. Isaacs, its counsel and chairman of the certificate holders' committee, that said participating certificates were absolutely worthless and the taxpayer could properly take a deduction of $18,000 as a bad debt during the year. The taxpayer had also been advised by its bankers that the participating certificates during the year 1920 were worthless.

8. In the year 1921 the erection of the Tivoli Theatre, one of the largest and most elaborate motion-picture theatres in Chicago, in the neighborhood of said Midway Gardens, brought thousands of patrons into the neighborhood daily, and due to the revival of real estate values in the neighborhood there was a complete change in the character of the neighborhood around Midway Gardens, resulting in an offer on the part of one Detrick to purchase the 99-year lease and convert the property into a dance hall, and toward the end of the year 1921 the said 99-year lease was sold at a price which netted a substantial distribution to the certificate holders, but such a revival of value could not have been foreseen by the taxpayer at the close of the year 1920.

#### DECISION.

The determination of the Commissioner is approved.

#### OPINION.

TRUSSELL: This taxpayer, together with all the other creditors of the corporation known as Midway Gardens, doing business in Chicago, finding that their debtor was unable to meet its obligations, entered into a compact, by virtue of which all the business assets of the debtor were placed in the hands of a trustee for the purpose of collecting rents and, if necessary, ultimately disposing of the debtor's property. The principal asset of the debtor was a 99-year lease upon certain lands in the City of Chicago.

During the period from 1916 to 1919 the operating value of the leasehold was predicated largely upon the use of the premises as a concert and beer garden, although this business did not produce any large profits. The coming of prohibition legislation temporarily caused tenants to give up their subleases and the income from the

ground lease to become nominal. It could not, however, be pre sumed that this condition would be permanent. A 99-year lease upon property in the business district of Chicago where the population is increasing and business growing rapidly may well be an asset of substantial value which can not be destroyed by the temporary effects of prohibition legislation. While it no doubt is true that during the latter part of the year 1919 and the year 1920 the prospects of this taxpayer's realizing anything upon its claim looked dark, the leasehold security still existed, and this taxpayer, together with its associated creditors who had entered into an understanding to rely upon the uses or the disposition of this leasehold property for the collection of their claims, was in a position in 1920 not seriously different from what it had been during one or more prior years. We are of the opinion that it should have patiently awaited the final outcome of the situation so long as the trustee controlled the 99-year lease. The right to occupy and use business premises in a large and growing city is an asset which can not be destroyed by temporary conditions, and we are led to the conclusion that the writing off of the taxpayer's claim in December, 1920, was premature.

ARUNDELL not participating.